IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JASON BENOIT,

                                 Case No.:  3:17-cv-00854-MMH-JBT

      Plaintiff,

v.

CITY OF LAKE CITY, Florida
a Florida municipal corporation and
GERALD L. FORD, individually,

      Defendants.

_____)

**DEFENDANT CITY OF LAKE CITY'S MOTION FOR SUMMARY
JUDGMENT (A DISPOSITIVE MOTION) AND MEMORANDUM OF LAW**

      Defendant, CITY OF LAKE CITY (the "City"), pursuant to Rule 56, Federal Rules of

Civil Procedure, moves this Court for final summary judgment in its favor as to Plaintiff's

Complaint.  In support of this Motion, the City states:

**INTRODUCTION AND MOTION**

      This action arises from the arrest of Jason Benoit ("Benoit"), by Officer Gerald Ford,

on July 1, 2014, for violation of an injunction for protection, stalking, and violation of

probation.  The Complaint asserts the following cause of action against the City:

      Count II:      False Arrest/False Imprisonment Claim under Florida Law.

      1.      The City is entitled to summary judgment as to the arrest/false imprisonment

claim because the record evidence establishes that Officer Ford had probable cause to arrest

Plaintiff on July 1, 2014.

2.       Alison Melissa's 911 call; the existence of a recently issued permanent injunction of protection issued by the Third Circuit Court in and for Columbia County; Officer Ford's observations and in person interview with Melissa; and her handwritten sworn affidavit, established probable cause.

3.       Events that occurred after Plaintiff's arrest do not retroactively eliminate the probable cause that existed at the time of arrest.

4.       Because the initial arrest was based on sufficient probable cause, the fact that Melissa was later convicted of making a false police report does not make Officer Ford or the Lake City Police Department retroactively liable for false arrest.

5.       Melissa was a citizen-informant who met the reliability factors necessary to establish probable cause under the law that provides that information provided by a reliable citizen-informant is sufficient to establish probable cause.

For the above reasons, along with the reasons stated in the Memorandum of Law below, The City respectfully requests that the Court enter final summary judgment in its favor as to Plaintiff's claim for false arrest/false imprisonment sought in Count II of the Complaint.

## MEMORANDUM OF LAW

### I.       STATEMENT OF FACTS

This action arises from the arrest of Jason Benoit, by Officer Gerald Ford, on July 1, 2014, for violation of a permanent injunction for protection, stalking, and violation of probation. (See Doc. 3, Pl's. Comp. ¶ 8).

On the night of July 1, 2014, Officer Ford was dispatched to respond to a call from Allison Melissa ("Melissa"), reporting domestic violence and harassment by Benoit, in

violation of a permanent injunction for protection issued by the Third Judicial Circuit Court, in and for Columbia County ("the Permanent Injunction").  (*911 audio recording* attached as **Exhibit A**; *Ford Dep.* 23:19-24:17, Feb. 5, 2018, attached as **Exhibit B**).  When Officer Ford arrived at Melissa's apartment, he interviewed her about her report, and she informed him that she had a permanent injunction for protection for domestic violence against Benoit, he was repeatedly harassing her, and she was worried for her safety. (See Police Report, attached as **Exhibit C;** Ford Dep. 28:13-30:1).  Melissa also showed Officer Ford a copy of her Permanent Injunction of Protection against Benoit. (Ford Dep. 89:5-16). The Permanent Injunction had been issued May 27, 2014, only four weeks before Ms. Melissa's 911 call for help.  **Exhibit D** (Permanent Injunction).  Additionally, Melissa filed an official handwritten sworn affidavit attached **as Exhibit E,** verifying her allegations against Benoit.  Melissa's affidavit alleged that in the three days preceding the arrest, Benoit had called Melissa 23 times, hacked her Facebook, emailed her, and threatened to come to her home if she did not respond to him. (**Exhibit E**). Melissa stated that she was scared and worried for her safety, making it clear that she "know[s] he will hurt me." *Id.*

At the scene, Melissa also showed Officer Ford documents and her phone, which showed 23 calls from a number listed as Benoit.  (Ford Dep. 36:14-24, 37:2-6).  At the time Officer Ford viewed the phone with the 23 calls, he did not believe there was another way to verify that the calls actually came from Benoit's phone. (Ford Dep. 38:8-18).   After interviewing Melissa, Officer Ford returned to the police station to look up the Permanent Injunction and to verify that it contained a no contact provision. (Ford Dep. 89:5-16). Officer Ford then discussed the violation of the Permanent Injunction and other documents with his

supervisor, Sergeant Paul Kash. (Ford Dep. 91:6-9). Officer Ford then received clearance from Sergeant Kash to make the arrest because Benoit lived outside of the city limits in the Columbia County. (Ford Dep. 90:6-17).  Ms. Melissa lived inside the City limits.  Based on the above information, Officer Ford, with the assistance of the Columbia County Sheriff's Office, went to Benoit's home to execute the arrest.

A few days after the arrest, Officer Ford drafted a supplemental report to include information he may have left out of his initial report. (Ford Dep. 100:16-25). The supplement report specifically detailed 23 calls received by Melissa over 3 days. (Ford Dep. 103:1-17, Ex. 1). Officer Ford testified that the calls and the times they were made, were acquired from Melissa's phone and that the information was not fabricated by him. (Ford Dep. 103:1-17). Officer Ford testified that he relied on the 23 calls and the fact that the Permanent Injunction had been violated due to contact, as the basis for his probable cause. (Ford Dep. 101:6-102:7). Officer Ford also relied on the sworn statement written by Melissa as another basis for his arrest of Benoit. (Ford Dep. 109:4-9). Officer Ford stated that one of the primary purposes of his investigation was to ensure Melissa's safety. (Ford Dep. 34:16-19). Officer Ford agreed with Plaintiff's counsel that although an officer has discretion on whether to arrest an individual, the situation here was a domestic violence situation and had he not arrested Benoit, Benoit could have hurt Melissa (Ford Dep. 106:6-10).

On January 9, 2018, the deposition of Jason Benoit was taken in Lake City, Florida, and he was questioned about the events surrounding the arrest at issue.  On the morning of July 1, 2014, Benoit got up and went to work. (Benoit Dep. 160:22-25, Jan. 9, 2018, attached as **Exhibit F**).  On the night of July 1, 2014, Officer Ford and two Columbia County Sherriff

Deputies, came to Benoit's home and informed him that they were there because Benoit had tried to call and email Melissa in violation of the Permanent Injunction against him. (Benoit Dep. 29:18-30:6 & 105:18-25).  Present at the time of the arrest, was Anna Sporandio, Benoit's current girlfriend, her brother, Brannon Young and Sporandio's husband, Vincent Sporandio. (Benoit Dep. 40:1-4).  The two Columbia County Sherriff Deputies were present and in earshot during Officer Ford's interactions with Benoit. (Benoit Dep. 105:1-5). Benoit believes that the Deputies were not in agreement with Officer Ford's actions, but he stated that the Deputies never actually told him that they did not agree with how Officer Ford handled the arrest. (Benoit Dep.105:6-106:4).  In his Complaint, Benoit claims that Officer Ford may have been under the influence of drugs or alcohol the night of arrest at issue, but when questioned about whether he had any evidence of this, Benoit repeatedly answered that he did not. (Benoit Dep. 34:8-36:1). Officer Ford and the two Deputies were at Benoit's home for roughly 20 to 30 minutes. (Benoit Dep. 161:7-10).  July 1, 2014, was only the second time that Benoit had interacted with Officer Ford, the first was on another occasion when Melissa had called law enforcement to the home she and Benoit shared together.

The day after the arrest, Benoit was brought before Judge Thomas B. Coleman for his first appearance.  Judge Coleman found probable cause for Benoit's arrest based on the information contained in Officer Ford's initial police report. (Benoit Dep.33:14-34:7; Nydam Affidavit ¶ 9, attached as **Exhibit G**). Ryan Nydam an Investigator for the State Attorney's Office for the Third Judicial Circuit, has personally known Judge Coleman to review probable cause evidence at first appearances and to determine that no probable cause existed for the

arrest. (Nydam Affidavit ¶ 9). When questioned at his deposition about the probable cause

evidence cited in the police report and by the City below, the following exchanges took place:

>With regard to the Permanent Injunction;

>>Q:    Okay.   Mr. Benoit, we were talking about this injunction
>>before we went off the record. Do you still have it in front of
>>you?
>>A:    Yes, sir.   I was just reading it.
>>Q:    So I just want to be clear, even though you weren't there
>>in person, you did attend the hearing via video conference?
>>A:    Yes.
>>Q:    Okay.   And you've had a chance to look at it now.   You
>>said it's the first time you saw it?
>>A:    Yes.
>>Q:    If you would have called Allison Melissa, would that have
>>been a violation of injunction?
>>MR. BONDERUD: Object to form.
>>A:    Yes.
>>Q:    If you had texted Allison Melissa, would that have been a
>>violation of this injunction?
>>A:    Yes.
>>MR. BONDERUD:   Object to form.   Calls for legal conclusion.
>>Q:    If you had e-mailed Allison Melissa, would that have been
>>a violation of this injunction?
>>MR.  BONDERUD:    Object  to  form.    Calls  for  legal
>>conclusion.   You can answer.
>>A:    Yes.

(Benoit Dep. 26:2-25).

Further, Benoit agreed that the Permanent Injunction was in effect on the night of the arrest at

issue:

>>Q:    Okay.   So would this injunction have been in effect on
>>June 30th, 2014?
>>A:    Yes.
>>Q:    Would it have been in effect on July 1st, 2014?
>>A:    Absolutely.
>>Q:    And how about July 2nd --
>>A:    It sure would have.

(Benoit Dep. 27:15-22).

When questioned about Melissa's hand written sworn statement, Benoit stated the
following:

> Q:   So I'm handing you a copy of the document marked as
> Defendants' Exhibit 4.  Sir, can you identify that document?
> A:   That's her statement she wrote.
> Q:   And do you recognize Allison Melissa's handwriting?
> A:   Yes, ma'am.
> Q:   Is this her handwriting?
> A:   Yes, ma'am.

(Benoit Dep. 116:18-117:1).

Benoit further authenticated that the handwriting and signature present on the Sworn

Statement belong to Melissa. (Benoit Dep. 118:10-14, Exhibit 4). Benoit stated that he did not

believe Officer Ford was in possession of the Sworn Statement when he arrested him because

he would not or could not provide him with a copy, but when questioned as to why he believed

that, the following exchange took place;

> Q:   So other than your conversation with Officer Ford, do
> you have any proof that he didn't have this statement?
> A:   No, I don't.  I don't have any proof that he had it.  I don't
> have any proof that he didn't have it.

(Benoit Dep. 167:20-25).

Benoit also agreed that Melissa's 911 call was the reason that Officer Ford was sent by

the Lake City Police Department to investigate the call, stating;

> Q:   It's okay.   Are you aware that the 911 call from Allison
> Melissa was the call that caused Lake City Police Department
> to be involved in your --
> A:   Yes, ma'am.
> Q:   -- arrest?
> MR. BONDERUD:   Object to form.
> Q:   Are you aware -- have you ever listened to the 911 call?

A:    Yes, I have.   Funny.

(Benoit Dep. 114:3-12).  Benoit was not present when Officer Ford interviewed Melissa and does not know what they spoke about, what her demeanor was like, or how their interaction was. (Benoit Dep. 28:4-17).

Following his arrest, Benoit spent ten (10) days in the Columbia County Jail, before he was transferred to the custody of the Sarasota County Sheriff's Office, where he spent an additional twenty (20) days in the Sarasota County Jail for violation of probation. (See Pl's. Comp. ¶ 34-35).  On July 28, 2017, a no information was filed in Columbia County and advised that the State would not pursue any criminal charges against Benoit. (Id. at ¶ 36). On July 30, 2017 Benoit was released from the Sarasota County Jail after his charge of violation of probation was dismissed. (Id. at ¶ 37).

While in custody in the Columbia County Jail, Benoit was visited by Ryan Nydam an Investigator for the State Attorney's Office for the Third Judicial Circuit. (Nydam Dep., 5:8-15, Feb. 26, 2018, attached as **Exhibit H**; Nydam Affidavit, ¶ 4). Investigator Nydam was contacted by Benoit's girlfriend the day of the arrest and informed that Mr. Benoit wanted to speak with him. (Nydam Dep., 7:16-25, 8:1-12; Nydam Affidavit ¶ 3). That same day, Investigator Nydam went to the jail to speak with Benoit. (Nydam Dep. 8:22-9:1-4,).  Benoit informed Nydam that he was innocent and did not contact Melissa; providing Nydam with the login information for his email accounts, social media accounts, and Verizon Mobile Application. (Nydam Dep. 9:9-20; Nydam Affidavit ¶ 4). The initial investigation required Nydam to review Mr. Benoit's cell phone, social media accounts and laptop computer.  After conducting his initial investigation Nydam did not find contact between Plaintiff and Melissa

during the time period associated with this case. (Nydam Dep.11:2-8; Nydam Affidavit ¶ 5). Nydam then sent a subpoena to Verizon for official cell phone records for Plaintiff and Melissa. (Nydam Dep. 11:24-12:1; Nydam Affidavit ¶ 6).  Melissa declined to speak with Nydam about his investigation.  (Nydam Dep. 12:7-8).  It took a full 10 days before Nydam received official records from Verizon, representing Plaintiff's and Melissa's cell phone use during the time period associated with this case.  (Nydam Dep. 12:13-15; Nydam Affidavit ¶ 6). The records indicated that there were no calls from the number Benoit provided to Nydam, to Melissa's phone.  (Nydam Dep. 12:16-19). Next, Nydam consulted with the Assistant State Attorney, and filed charges against Melissa for making a false police report. (Nydam Dep. 13:1-7; Nydam Affidavit ¶ 7).  Nydam and the State Attorney's Office attempted to release Mr. Benoit from jail but that was complicated by the fact that he was transferred out of the county due to a violation of his pre-existing probation.  (Nydam Dep. 13:22-14:6). Nydam had previously investigated Plaintiff for a past battery arrest involving Melissa in April of 2014; those charges were eventually dropped. (Nydam Dep.15:9-16:2; Nydam Affidavit ¶ 3).  On August 1, 2014, Ms. Melissa was charged with filing a false police report and knowingly giving false information to a law enforcement officer.  On September 1, 2014, Ms. Melissa was sentenced to twelve (12) months' probation and fines for filing a false police report.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The Court must view the evidence and the

inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  When opposing a motion for summary judgment, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Summary judgment is proper in a false arrest claim where probable cause existed for the arrest, because probable cause is a complete bar to an action for false arrest and false imprisonment. Bolanos v. Metro. Dade Cty., 677 So. 2d 1005, 1005 (Fla. 3d DCA1996).

## III.   ARGUMENT

### a.  Probable cause bars Benoit's claims for false arrest/imprisonment.

The existence of probable cause bars Benoit's claims for false arrest and false imprisonment.  Lee v. Geiger, 419 So. 2d 717 (Fla. 1st DCA 1982); Rankin v. Evans, 133 F.3d 1425 (11th Cir. 1998).  Mr. Benoit's false arrest claim against the City is made under Florida law; thus, the City has the burden of proof on its affirmative defense that probable cause existed.  Rankin v. Evans, 133 F.3d 1425, 1436 (The only difference in the probable cause analysis applicable to the state and federal claims…. is which party carried the burden of proving whether probable cause existed.  The existence of probable cause constitutes an

affirmative defense to the claims of false arrest and imprisonment under Florida law.")  Here, the City asserted probable cause as an affirmative defense.  (Doc. 4, Seventh Affirmative Defense: "Probable cause existed for the plaintiff's arrest.")

Probable cause exists when the facts and circumstances, of which the officer has reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed, is committing, or is about to commit an offense. Jordan v. Mosley, 487 F.3d 1350, 1355 (11th Cir. 2007).  Probable cause requires more than mere suspicion, but does not require convincing proof. Bailey v. Board of County Comm'rs of Alachua County, 956 F.2d 1112, 1119 (11th Cir. 1992). An officer does not have to have firsthand knowledge to establish probable cause. State v. Keen, 384 So. 2d 284, 286 (Fla. 4th DCA 1980). Additionally, "[n]o officer has a duty to prove every element of a crime before making an arrest. Police officers are not expected to be lawyers or prosecutors." Mosley, 487 F.3d at 1355. To show probable cause in a false arrest situation, it is not necessary that the arresting officer "know facts that would absolutely prove beyond a reasonable doubt the guilt of the person charged; probable cause exists when the circumstances are sufficient to cause a reasonably cautious person to believe that the person accused is guilty of the offense charged." Florida Game & Freshwater Fish Comm'n v. Dockery, 676 So. 2d 471, 474 (Fla. 1st DCA1996).

Events that occur after the arrest do not eliminate probable cause when probable cause existed at the time of arrest. Id.  When "an officer arrests someone with probable cause, he is not liable for false arrest simply because the innocence of the suspect is later proved." Carter v. City of St. Petersburg, 319 So. 2d 602, 604 (Fla. 2d DCA 1975) (Citing Boca Raton v. Coughlin, 299 So.2d 105 (Fla. 4th DCA 1974)).

A false arrest claim under § 1983 is substantially the same as a claim for false arrest under Florida law. Pollard v. City of Fort Myers Police Dep't, No. 2:15-CV-79-FTM-29DNF, 2015 WL 859397, at *4 (M.D. Fla. Feb. 27, 2015). According to Pollard, a plaintiff must prove three elements to sustain a claim for false arrest under Florida law, "(1) an unlawful detention and derivation of liberty against the plaintiff's will; (2) an unreasonable detention which is not warranted by the circumstances; and (3) an intentional detention." Id. Probable cause exists, "if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." Id.

Probable cause existed for Benoit's arrest on July 1, 2014, because the facts and circumstances, based on reliable information provided by Melissa, would have caused a prudent person to believe that Benoit had violated the Permanent Injunction and committed, was committing, or was about to commit an act of domestic violence. First, Melissa's 911 call to the LCPD, where she reported Benoit's harassment, threats, and his violation of the Permanent Injunction, provided the basis for an initial investigation.

Second, Officer Ford was dispatched by the LCPD to Melissa's apartment where he was instructed to make contact with Melissa about her report. (Ford Dep. 23:19-24:6). At Melissa's apartment Officer Ford interviewed her and she informed him that she had a Permanent Injunction against Benoit, he was harassing her, and she was afraid for her safety. (**Exhibit C**, pg. 2-3; Ford Dep. 28:13-30:1). The Police Report documents that Officer Ford observed that Melissa had the "appearance of someone scared and nervous." (**Exhibit C**, pg.

3).  Also, Melissa provided Officer Ford with a copy of the Permanent Injunction, issued by the Court only four weeks prior, which documented Benoit's past domestic violence violations, showed that the injunction was permanent, and that it contained a no contact provision. (**Exhibit B; Exhibit C**, pg. 3; Ford Dep. 89:5-16). Not only was Officer Ford presented a copy of the Permanent Injunction at the scene, but he also went to the station to independently verify its existence and that it contained a no contact provision. (Ford Dep. 89:5-16).

Third, Melissa provided Officer Ford with a handwritten sworn affidavit that contained the following statement:

> [m]y ex, Jason Benoit, has a Permanent Injunction on him for my protection. In the last 3 days, I have received 23 phone calls from him, he hacked my Facebook account, and he emailed me from a disguised email account. I have ignored him, and he still continued calling me. This afternoon, I received the last email stating if I didn't answer the phone, he would come to my house. I am scared and don't want him anywhere near me, so I contacted the police. I know he will hurt me!

(**Exhibit E**). Officer Ford relied upon the sworn statement as a basis for probable cause to arrest Benoit.   (Ford Dep. 109:4-9).

Based on the above circumstances and the background information provided by Melissa, Benoit was located at his residence and arrested with probable cause by Officer Ford. The facts and circumstance surrounding Benoit's arrest provided more than the necessary probable cause to justify Officer Ford's actions.  On October 10, 2017, Officer Ford served Plaintiff and the City with his Sworn Answers to Plaintiff's First Interrogatories, attached as **Exhibit I.**  Interrogatory number three (3) and four (4), requested information regarding what Officer Ford relied upon when investigating the allegations against Benoit, and effectuation his arrest. (**Exhibit I**, No. 3-4). In response, Officer Ford answered that he relied upon,

Melissa's 911 call; the permanent injunction of protection granted by the Third Circuit Court in Columbia County; his in-person interview with Melissa; and her handwritten sworn affidavit as the basis of his arrest.  Id.  Further, Officer Ford's deposition testimony corroborates his answers to his interrogatories (Ford Dep. 23-19-24:6, 28:13-30:1, 89:5-16, 109:4-9). Based on his investigation, Investigator Nydam understood that at the time of the arrest Officer Ford relied on the existence of the Permanent Injunction, Ford's in-person interview of Melissa, and the sworn affidavit, to establish probable cause for the arrest. (Nydam Affidavit ¶ 12). When combined, all of the above circumstance would have caused a reasonable officer under the circumstances to believe, as Officer Ford did, that Benoit had violated the Permanent Injunction and, had, or was about to commit an act of domestic violence against Melissa.

Investigator Nydam, who was an independent investigator for the State Attorney's Office, stated in his affidavit; "Although my investigation led to the conclusion that the evidence did not support a finding that Jason Benoit was guilty beyond a reasonable doubt of violating a domestic violence injunction or stalking, **I believe that based on the facts, circumstances, and evidence that existed at the time of his arrest, probable cause existed for the arrest**. (Nydam Affidavit ¶ 11) (Emphasis added). Further, "I believe that under the circumstances, it **would have been reasonable for an Officer to determine that they had probable cause** to arrest Jason Benoit for violating a domestic violence injunction. (Nydam Affidavit ¶ 13) (emphasis added).

Plaintiff's Complaint alleges that Benoit's arrest lacked the necessary probable cause because after the arrest the LCPD learned that Melissa's report contained some false information, and it was not reasonable for Officer Ford to have relied on the information.

14

However, Officer Ford did not have a duty to prove every element Benoit's alleged crimes before making the arrest. <u>Mosley</u>, 487 F.3d at 1355. Additionally, even though Benoit's innocence was later proved, that does not retroactively erode the probable cause from Officer Ford's arrest. <u>Carter</u>, 319 So. 2d at 604.

Plaintiff's counsel may also attempt to discredit Officer Ford's incident report and investigation because the incident report was missing certain descriptive information such as Benoit's weight, eye color, hair color, and listed his address as unknown. (Ford Dep. 63:6-67:12). However, Officer Ford testified that much of the missing information is automatically populated into the report through the LCPD's computer database, especially if an individual had been previously arrested. <u>Id.</u> In addition, Officer Ford agreed with Plaintiff's counsel that while such information is important, it is not uncommon for a suspect's address to be unknown. <u>Id.</u> While issues concerning missing descriptive information in the report may raise questions regarding the reporting system, they do not erode the probable cause that existed at the time of Benoit's arrest.  The City, like many police agencies, uses software known as "Smart Cop" which employs dropdown menus to make the creation of incident reports faster and more efficient.  **Exhibit J**, Affidavit of John A. Miles, ¶ 6-9, 12-13.  Much of the information entered on a report is automatically transferred into a report before the investigating officer responds to the call.  <u>Id.</u>  For example, the dispatcher enters the information regarding the potential offense based on information given in the 911 call.  <u>Id.</u>  Here, the charges against Benoit were Fla. Stats. § 741.31(4)(a) (Domestic Violence Injunction) and §784.048(2) (Stalking). **Exhibit C.**  The statutory elements for a 741.31(4)(a) violation include telephoning, contacting or otherwise communicating with the petitioner directly or indirectly.  The elements of a stalking

claim include "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person." To prove a violation of an Injunction for Protection against Domestic Violence, the State must prove the existence of an injunction issued by a court and a willful violation of the injunction. *Florida Standard Criminal Jury Instruction,* 8.18. These elements were established through information Officer Ford obtained.

Plaintiff's counsel may also attempt to discredit Officer Ford's report and investigation because certain informational boxes in the report detailing information about the extent of injury, general appearance, demeanor, and other topics were not filled out. (Ford Dep. 68:19-69:12). However, much of that information was described in the narrative section of the report, which states, "Melissa, who stated 'My ex, Jason Benoit, has a restraining order on him for my protection';" "Melissa stated 'in the last three days, I have received twenty-three phone calls from him' he hacked my face book account, and emailed me from a disguised email account';" "Melissa stated 'I am scared and don't want him anywhere near me, so I contacted the police';" and "Melissa had the appearance of someone scared and nervous." (**Exhibit C**, pg. 2-3). Officer Ford confirmed that he uses the narrative section of the report to document his observations and what he did to investigate. (Ford Dep. 73:23-74:7). Officer Ford confirmed that the lengthy narrative section was authored by him and was not computer generated. (Ford Dep. 79:10-18). The most important part of an Offense Report is the narrative section because it is not computer generated, but is completed independently by the officer. **Exhibit J** ¶ 10. It is the narrative section that tells the story of what happened and provides necessary details such as how the officer got to the scene; who they spoke with, the content of their conversation; their observations, etc… Id.

Plaintiff may argue that the Verizon records eventually confirmed that there were no calls from Benoit to Melissa; therefore, Officer Ford's investigation was flawed. However, Investigator Nydam testified that he had to subpoena Verizon for the phone records and that it took him 10 days to get the official records from Verizon. (**Exhibit H,** Nydam Dep. 12:13-15; **Exhibit G,** Nydam Affidavit ¶ 6). Waiting 10 days for official records to arrest Benoit, would not have been appropriate especially since the allegations involved domestic violence.  Officer Ford's duties differed from Investigator Ryan's duties in that one is safety based and the other is investigation based with the benefit of more time.  (**Exhibit J**, Miles Affidavit ¶25.)

In addition, Plaintiff may alleged that Officer Ford's investigation was not thorough enough because the investigation conducted by Investigator Nydam clearly showed no contact between Benoit and Melissa. However, in his affidavit, Investigator Nydam makes it clear that:

> As a part of my job I have the responsibility to investigate criminal charges post-arrest to determine whether the evidence would support a conviction for the alleged offense.  **However, the standard that I apply to my post-arrest investigations is different from the probable cause standard utilized by police officers conducting an initial investigation.** The investigations I conduct **typically take more time and are more in-depth than those conducted by the average police officer**.

(Nydam Affidavit ¶ 10) (emphasis added).

The City has the burden of proving the existence of probable cause such that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Based on the above analysis, the city has carried its burden.  However, Plaintiff has the burden to provide rebuttal evidence that a genuine issue of material fact exists.  Plaintiff, "may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Here, Plaintiff's

Complaint, contains mere allegations and denials that are not supported by record evidence. Any allegation that Officer Ford lacked probable cause because Benoit was eventually found innocent, Melissa lied to the investigating Officer, or Officer Ford's report was missing irrelevant descriptive information such as weight and clothing, are without merit under the law and the record evidence in this case. Notably, the Complaint that "Alison Melissa's allegations, if true, would have created probable cause to believe that Plaintiff had committed a crime." Doc. 3, ¶11. This allegation places the blame for Mr. Benoit's arrest directly on the person whose actions *caused* the arrest, Alison Melissa.

> **b. Melissa's report that Benoit was engaging in harassing phone calls and the fact that her phone depicted 23 calls from a number listed as Jason Benoit was enough to create probable cause even without additional investigation.**

A victim's report of harassing phone calls alone is enough to lead an officer of reasonable caution to believe that the person to be arrested has committed an act of harassment. Armatas v. Maroulleti, No. 08-CV-310 SJF RER, 2010 WL 4340437, at *7 (E.D.N.Y. Oct. 19, 2010). A victim's report of harassing phone calls, and an officer's observation that a victim has numerous phone calls from a restricted number on her caller identification was enough to establish probable cause. Taylor v. Taylor, 649 F. App'x 737, 744 (11th Cir. 2016).

In Armatas v. Maroulleti, the Plaintiff filed a claim against the New York City Police Department, the City of New York, Elena Maroulleti, and other individual defendants for false arrest. Armatas v. Maroulleti, No. 08-CV-310 SJF RER, 2010 WL 4340437, at *1 (E.D.N.Y. Oct. 19, 2010). Maroulleti hosted a weekly radio program that was aimed at promoting and preserving Greek culture. Id. Armatas sought out Maroulleti to have her investigate allegations that New York City hospitals were performing unconsented circumcisions on immigrant

infants, Maroulleti suggested he call his local elected official. Id. Later Armatas again contacted Maroulleti on her cell phone about one of her guests on the show, she alleged that Armatas threatened to "do things to [her] and [her] family that you don't even want to think about." Id. Armatas then called Maroulleti's production company four time and left messages, as well as called her cell phone the next day despite her requests that he stop. Id. at *1-2. Maroulleti then filed a complaint with the NYPD alleging that Armatas had called her phone several times and made threats. Id. at *2. Eric Christophersen, a detective for the NYPD, claims to have called Maroulleti to confirm the report, although Maroulleti couldn't confirm that the call occurred. Id. Christophersen went to Armatas' home to speak with him about the allegations. Id. Armatas' two young sons were present during the arrest. Id. Christophersen claims to have showed Armatas the report and informed him that he was being arrested on the basis of that report. Id. Christophersen did not make the decision to arrest at the direction of any supervisor or at the specific request of Maroulleti or anyone else, rather the decision whether to make the arrest or not was completely within his discretion. Id. Christophersen claims that Armatas did not deny the allegations but called Maroulleti crazy. Id. However, Armatas claims he was never asked whether the allegations were true and was only informed that he needed to go to the station. Id. Armatas was charged the next day with aggravated harassment and harassment, but the charges were later dropped. Id. at *3. The City Defendants moved for summary judgment based on the defense of probable cause. Id.

The court held that "Maroulleti's report alone was sufficient to lead an officer of reasonable caution to believe that Armatas was guilty of harassment." Id. Further, "[t]here was no objective reason to doubt that the accusations in Maroulleti's report were truthful and made

in good faith. Although Armatas told the police Maroulleti was crazy, an accused's self-serving statements and denials upon hearing of a complainant's accusations do not raise sufficient doubt as to her veracity to necessitate further investigation." Id. The police, "were not required to seek out reasons to doubt Maroulleti's claim," and therefore, "were entitled to rely on Maroulleti's account of the facts to establish probable cause." Id. Armatas argued that "the police could 'inherently' not have probable cause because they did not fully investigate Maroulleti's claim before making an arrest; however, the police "are not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Id. Based on that analysis the court granted summary judgment based on probable cause. Id. at *8.

In Taylor v. Taylor, Lynda Wammock, complained to the Sherriff's department that the plaintiff, Sherrilyn Taylor, had been calling her several times a day cussing her out and threatening her. Taylor v. Taylor, 649 F. App'x 737, 739 (11th Cir. 2016). When Deputy Richard Taylor went to Wammock's home to investigate, Wammock identified Taylor as the caller and claimed she recognized her voice because they had known each other 20 years. Id. The Deputy observed Wammock's phone which had numerous calls from a restricted number on the caller identification screen. Id. The Deputy went to Taylor's home to speak with her about the allegations, she denied making the calls and offered her phone for inspection, but the Deputy did not look at Taylor's phone. Id. Three days later, Wammock again complained to the Sherriff's Department about continued phone calls and the Deputy again verified that there were calls from a restricted number. Id. at 740. Using the report and unidentified calls as evidence of probable cause, a judge issued a warrant for Taylor's arrest. Id. Taylor was then arrested and due to the aggressive nature of the arrest, suffered physical injuries. Id. at 741.

The arrest resulted in a violation of Taylor's parole, and she spent three weeks in jail. Id. Taylor's case was presented to the grand jury who refused to indict on the charges. Id.  The Defendants moved for summary judgment and it was granted by the lower court. Id.

The Eleventh Circuit affirmed the summary judgment and held that "Ms. Taylor has not shown that it was 'entirely unreasonable' for Deputy Taylor to believe, in the particular circumstances of this case, that he had probable cause to arrest Ms. Taylor for making harassing phone calls and terroristic threats." Id. at 744. In addition, "When Deputy Taylor applied for the arrest warrants, he had been given an account of the alleged harassing and threatening phone calls from Wammock, the purported victim-witness, which included some details of the statements," and "[g]enerally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause." Id. "Moreover, Deputy Taylor had corroborated Wammock's claims to a limited extent when he went to her home and observed that she had numerous telephone calls from a restricted number on her caller identification." Id. However, "Ms. Taylor primarily argues that Wammock was not a reliable witness and that she did not provide reasonably trustworthy information," but, "Ms. Taylor has pointed to no information known to Deputy Taylor, or reasonably available to him, that would have indicated to him that Wammock was unreliable and untrustworthy." Id.  The court noted, "**even if Deputy Taylor had looked at Ms. Taylor's phone when she offered it, the most he could have discovered was that she did not use that particular phone to make the calls, not that she did not make the calls at all**." Id. at 745 (emphasis added).  Taylor argued that the uncorroborated testimony was obviously insufficient because she was not convicted, but the court held that, "even assuming that uncorroborated testimony was all Deputy Taylor had which was ultimately

found to be insufficient to convict under Georgia law, probable cause does not require specific evidence that would be sufficient to sustain a conviction." Id.

Similar to the cases cited above, Officer Ford relied on the report filed by Melissa to the LCPD, he verified that her caller identification reflected calls from the alleged perpetrator, and he followed up on her report by conducting an in person interview.  In addition, Officer Ford also relied upon Melissa's sworn statement, the existence of the recently issued Permanent Injunction, and brought the matter to the attention of his supervisor before effectuating the arrest with the assistance of the Sherriff's Office.  Any contention that probable cause did not exist because Melissa was an unreliable witness or that Officer Ford failed to conduct an extensive enough investigation is without merit.  An objective officer, faced with this information, would have believed that probable cause existed.  Nydam Aff. ¶ 11-13.  As in the Taylor case, Officer Ford's attempt to look at the phone Benoit provided to him at the time of the arrest would not have exonerated Mr. Benoit.  Like in Taylor, it was entirely possible that Benoit did not make the calls from the cell phone he may have offered Officer Ford.  In both Taylor and Armatas, the officers relied upon significantly less probable cause evidence than Officer Ford had when effectuating their respective arrests.  While the Deputy in Taylor did have a warrant, that warrant was based on less probable cause evidence than in the instant case in which Judge Coleman found probable cause.

### c.  The information relied upon by Officer Ford was reliable enough to justify police action.

A tip from a citizen-informant who observes a crime and reports it, along with the citizen-informant's identity, will almost always be found sufficient to justify police action. J.L.

v. State, 727 So. 2d 204, 206 (Fla. 1998). A citizen-informant includes the victim of a crime and is described as a person "who approaches the police in person to report criminal activity." Baptiste v. State, 995 So. 2d 285, 291 (Fla. 2008).  An identification or report from a citizen-informant can provide the basis for probable cause.  Johnson v. State, 567 So. 2d 32 (Fla. 1st DCA 1990).  The information provided by a citizen-informant does not have to be independently verified prior to making an arrest.  State v. Clark, 721 So. 2d 1202 (Fla. 3d DCA 1998) (where the citizen-victim reported the crime to the police).

In Johnson, a police officer responded to a call placed by a woman who claimed that her ex-husband was harassing her, tried to run her over, and made other threats, despite the existence of an injunction issued for her protection.  Id.  After speaking with the ex-wife and verifying the existence and validity of the injunction, the officer found the defendant in a bar next to the ex-wife's home.  Id.  No weapons were found on the defendant when he was arrested, but based on a records check the officer knew he was a convicted felon.  Id.  As the defendant was getting into his vehicle the officer spotted the butt of a gun and arrested the defendant for possession of a firearm by a convicted felon.  Id. at 33.  The defendant challenged the arrest, arguing that the officer lacked probable cause.  Id.  The court held that there was no doubt that the officer was acting within his authority when he escorted the appellant from the bar.  Id.  Further, based on the ex-wife's complaint, at the time of the arrest there existed probable cause to believe that an act of domestic violence had been committed in violation of the injunction.  Id.

In the instant case, Melissa as a potential victim and a resident in the City of Lake City, was a citizen-informant when she filed her report with the LCPD.  As in Johnson, Melissa

reported an episode of domestic violence to the LCPD, which dispatched an officer to address the report.  In <u>Johnson,</u> a female citizen reported an alleged episode of domestic violence in violation of a valid Permanent Injunction.  <u>Johnson,</u> 567 So. 2d at 32. The court in <u>Johnson</u> held that the ex-wife's report and presentation of a valid Permanent Injunction was enough to create the probable cause necessary for an arrest.  Here, Melissa's report, handwritten sworn affidavit, and presentation of a Permanent Injunction against Benoit, was more than enough to create probable cause.  Plaintiff alleges that Officer Ford was unreasonable in his reliance upon the information provided by Melissa, however, the information provided by her did not have to be independently verified before arresting Benoit.  <u>State v. Clark</u>, 721 So. 2d at 1202.

Certain factors tend to establish the reliability of information from a citizen-informant. <u>Redini v. State</u>, 84 So. 3d 380, 383-84 (Fla. 4th DCA 2012). In <u>Redini</u>, the roommate of Redini informed police that Redini was in possession of child pornography.  <u>Redini</u>, 84 So. 2d at 383. After obtaining a search warrant via a probable cause affidavit based on the roommate's information, the police seized Redini's computer and found child pornography.  <u>Id.</u> at 382. The state charged Redini with possession of sexual performance by a child.  <u>Id.</u> Redini moved to suppress the evidence based on the claim that the information supplied by Redini's roommate was not sufficiently reliable to show probable cause.  <u>Id.</u> at 381. In determining whether the roommate's information was sufficiently reliable to show probable cause, the court looked to the following factors;

> 1) a citizen-informant is motivated by the desire to further justice, 2) a citizen-informant who directly approaches law enforcement may be held accountable for false statements, 3) a face-to-face tip provides the opportunity to observe the demeanor and evaluate the credibility of the informant, and 4) there is greater potential for reprisal by the defendant than an anonymous tip.

Id. at 383-84 (citing Baptiste v. State, 995 So. 2d 285, 291 (Fla. 2008)). Applying these factors, the court reasoned that the roommate directly approached the police and gave a sworn statement for which the roommate could be held accountable.  Id. at 384. Additionally, the roommate's face-to-face contact with law enforcement provided the opportunity for law enforcement to observe the roommate's demeanor and credibility.  Id.  Finally, the fact that the roommate lived with Redini meant the roommate was willing to risk reprisal.  Id. Thus, the court concluded that the information given by the roommate was sufficiently reliable.  Id.

Here, Melissa meets all of the citizen-informant reliability factors outlined in Redini. At the time of the arrest it objectively appeared that she was seeking to stop Benoit from committing an act of domestic violence against her.  Melissa directly approached the LCPD for help, filed an affidavit swearing that her allegations were true and appeared to be genuinely scared and nervous (**Exhibit C**, pg. 3).  A significant opportunity for reprisal by Benoit, given their intimate history and the fact that the tip was not anonymous.  By personally approaching the LCPD and filing a sworn affidavit, Melissa knew that she could be, and ultimately was, held accountable for her false statements.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, the City respectfully requests that the Court find probable cause existed for Benoit's arrest and grant its Motion for Summary Judgment.

**MARKS GRAY, P.A.**

/s/ *Susan S. Erdelyi*
Susan S. Erdelyi, Esquire
Florida Bar No.: 0648965
Austin C. Sherman, Esquire
Florida Bar No.: 1002831
1200 Riverplace Blvd., Suite 800
Jacksonville, Florida 32207
Telephone:  (904) 398-0900
Facsimile:   (904) 399-8440
Email:  serdelyi@marksgray.com
Secondary: jmcduffie@marksgray.com
*Attorneys for City of Lake City*

**<u>CERTIFICATE OF SERVICE</u>**

I CERTIFY that on this 21st day of May 2018, I submitted the foregoing

document with the clerk for filing with the CM/ECF system which will provide

a notice of electronic filing and a copy of the foregoing to the following:

Andrew Bonderud, Esquire
The Bonderud Law Firm, P.A.
301 West Bay Street, Suite 1433
Jacksonville, FL 32202
BonderudLaw@gmail.com

Kevin C. Kostelnik, Esquire
Michael P. Spellman, Esquire
Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, FL 32301
kkostelnik@sniffenlaw.com
mspellman@sniffenlaw.com

/s/  Susan S. Erdelyi
Susan S. Erdelyi, Esquire