**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JASON BENOIT,

Plaintiff,

Case No. 3:17-cv-854-J-34JBT

vs.

CITY OF LAKE CITY, FLORIDA, a Florida municipal corporation, and GERALD L. FORD, individually,

Defendants.
_____________________________________/

# ORDER

**THIS CAUSE** is before the Court on Defendant Gerald L. Ford's Dispositive Motion for Summary Judgment (Doc. 33; Ford's Motion) and Defendant City of Lake City's Motion for Summary Judgment (A Dispositive Motion) and Memorandum of Law (Doc. 34; City's Motion) (collectively, "the Motions"), filed on May 21, 2018. On June 11, 2018, the Court entered an Order (Doc. 36) noting that it would treat the Motions as unopposed if Plaintiff Jason Benoit did not file a response by June 25, 2018. See Order. Pursuant to the Court's directive, Benoit filed Plaintiff's Response in Opposition to Defendants' Motions for Summary Judgment (Doc. 37; Response) on the deadline. With leave of Court, see Order (Doc. 39), Defendant City of Lake City (the "City") filed Defendant's Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 40; Reply) on July 25, 2018. Accordingly, this matter is ripe for review.

## I. Consideration of Defendants' Affidavits and Declaration

Defendants have provided various items of evidentiary material in support of the Motions, including the Affidavit of Gerald Ford (Officer Ford) (Doc. 32-1; Ford Aff.), the Affidavit of Ryan Nydam (Doc. 34-7; Nydam Aff.) and the Declaration of Kevin C. Kostelnik, counsel for Defendant Officer Ford, (Doc. 32-5; Kostelnik Declaration). Before considering the merits of the Motions, the Court will address one argument raised by Benoit with regard to the evidence presented by Defendants in support of their Motions.

In the Response, Benoit urges the Court to disregard the affidavits of Officer Ford and Nydam, as well as the Kostelnik Declaration. Response at 8. As to all three, Benoit argues that the affidavits and declaration should not be considered by the Court because they were produced after the close of discovery. Id. However, Benoit points to no authority which requires that affidavits or declarations submitted in support of a motion for summary judgment need to have been produced during the course of discovery. While Rule 56(c)(1)(A), of the Federal Rules of Civil Procedure (Rule(s)), requires a motion for summary judgment to be supported by "materials in the record, including . . . . affidavits or declarations . . .," nothing in the Rule suggests that the affidavits or declarations themselves have to have been produced in discovery in order to be considered in support of or in opposition to a motion for summary judgment. See Rule 56(c)(4) (requiring only that affidavits be made on personal knowledge, set forth facts that would be admissible at trial, and show that the affiant is competent to testify to these matters). Thus, to the extent Benoit seeks exclusion of the affidavits and declaration on this basis, his argument is unavailing.

With regard to Ford's Affidavit, Benoit also suggests that it should be disregarded because Officer Ford submitted only excerpts of his deposition "leaving out the portions of his deposition that contradict the affidavit." Response at 8. Again, Benoit cites no authority in support of this position. Notably, as a general proposition, "[i]n light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition." Kennett-Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir. 1980). Nevertheless, in appropriate circumstances, a court may disregard a "sham" affidavit that is inherently inconsistent with a party's prior deposition testimony. See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657-59 (11th Cir. 1984). However, the sham affidavit exception should be applied "sparingly because of the harsh effect [it] may have on a party's case." See Rollins v. TechSouth, Inc., 833 F.2d 1525, 1530 (11th Cir. 1987). Indeed, an affidavit may be disregarded as a sham only "'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" Tippens v. Celotex Corp., 805 F.2d 949, 953-54 (11th Cir. 1986) (quoting Van T. Junkins, 736 F.2d at 657) (alterations in Tippens).[1] In sum, the Eleventh Circuit requires "a court to find some inherent

[1] In Tippens, the plaintiff, individually and on behalf of her deceased husband, sued the defendant based on allegations that her husband was exposed to asbestos-containing products manufactured and sold by the defendant. See Tippens, 805 F.2d at 951. The district court granted defendant summary judgment after declining to consider, as a sham, the affidavit of a non-party, a co-worker of the deceased. Id. at 951-52. In Tippens, the witness's affidavit stated that he "used several products, including those of the defendant . . . , while working in close proximity to" the deceased. Id. In his deposition, however, the witness, although able to state that he used defendant's products, "was unable to pinpoint any specific instances where he worked in close proximity to [the deceased] while using the defendant's product" and "was also unable to identify any specific instances when he used [the defendant]'s asbestos containing products or to identify which [of defendant's] products contained asbestos." Id. Finding "[t]he apparent inconsistency between the affidavit and deposition" to be "merely an inability to recall specific times, places,

inconsistency between an affidavit and a deposition before disregarding the affidavit." Rollins, 833 F.2d at 1530 (citing Tippens, 805 F.2d at 954). Here, Benoit has made no effort to satisfy this heavy burden. Moreover, Benoit has had ample opportunity to address any discrepancies between the deposition and the affidavit, and more importantly, has had the opportunity to submit his own evidence that may conflict with either the Ford Affidavit or his deposition. Under these circumstances, any concern Benoit may have regarding alleged conflicting information is best addressed by viewing the record evidence before the Court in the light most favorable to him. Thus, the Court will not disregard Ford's Affidavit.

Last, Benoit urges that the Kostelnik Declaration should be disregarded for the additional reason that Officer Ford did not disclose Kostelnik as a witness (or person with knowledge) prior to the close of discovery and because Kostelnik "cannot be both the attorney of record and a witness." Response at 8. This argument, like the others addressed here, is unsupported by citation to any legal authority. A review of the Kostelnik Declaration discloses that it addresses only one issue relevant to the Motions. See generally Kostelnik Declaration. In Paragraph Three, Kostelnik authenticates three e-mails received in discovery from the City. Id. at ¶ .[2] The Court observes nothing improper in such a submission, and does not perceive it to violate Officer Ford's discovery obligations or transform his counsel into a witness for the purposes of this action. More importantly, Benoit does not contest the authenticity or content of the e-mails. Thus, his

---

and situations[,]" the Eleventh Circuit held that the witness's affidavit should have been considered: "Although a jury may find this discrepancy in [the witness]'s testimony to affect his credibility or to diminish its persuasiveness, it is not so inherently inconsistent that the court must disregard the previous affidavit as a matter of law." Id. at 951-52, 954.

[2] In Paragraph Four of the declaration, Kostelnik authenticates and identifies a facebook post. The Court finds the facebook post to be completely irrelevant to the issues before the Court on the Motions, and as such, declines to address it here.

request that the Court disregard the Kostelnik Declaration warrants no relief. Having addressed Benoit's arguments regarding Defendants' affidavits and declaration, the Court turns to its identification of the undisputed facts and the merits of the parties' arguments.

## II. Background Facts[3]

On July 1, 2014, Benoit's ex-girlfriend, Alison Melissa[4], called 911 and reported that Benoit violated a domestic violence injunction issued against him by the Circuit Court of the Third Judicial Circuit, in and for Columbia County, Florida on May 27, 2014. See 911 Audio Recording of Melissa's Call to Lake City Police Department (Doc. 32-1; 911 Call); Final Judgment of Injunction for Protection Against Domestic Violence Without Minor Child(ren) (After Notice) (Doc. 34-4; Injunction). The Injunction prohibited Benoit from committing any acts of domestic violence against Melissa and from contacting Melissa, directly or indirectly, "by mail, e-mail, fax, telephone, through another person, or in any other manner." See Injunction at 1-2. The Injunction further prohibited Benoit from violating the Injunction "through an intentional unlawful threat, word or act to do violence." Id. at 1. In her 911 Call, Melissa told the Lake City Police Department (LCPD) dispatcher that Benoit called and e-mailed her repeatedly over the past three days, hacked one of her accounts, and threatened to show up at her home if she did not respond to his advances. See 911 Call. The LCPD dispatched Officer Ford, who had been a patrol officer with the LCPD since 2011, to Melissa's home located at 394 SW Saint Johns Street, Lack City,

3 The facts recited in this section are either undisputed, or any disagreement has been indicated. Because this case is before the Court on Defendants' Motions, the facts recited herein, and all reasonable inferences therefrom, have been viewed by the Court in a light most favorable to Benoit. See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

4 The spelling of Melissa's first name is unclear, as it appears in the record as "Alison" and "Allison." Compare Complaint ¶¶10-13 with Offense Report at 1.

Florida 32055. See Videotaped Deposition of Gerald L. Ford (Doc. 34-2; Ford Dep.) at 8-9, 23-24, 27,[5] Ex. A: Offense Report at 1.[6] The dispatcher told Officer Ford that the call involved the violation of a domestic violence injunction. See Ford Dep. at 23-24.

When Officer Ford arrived at Melissa's home, he observed that she "had the appearance of someone scared and nervous." See Offense Report at 1, 3. Melissa showed Officer Ford a copy of the Injunction and said she was scared because she knew Benoit would hurt her. Id. at 3. She also said that Benoit had e-mailed her several times from a disguised e-mail address and showed Officer Ford three of the messages. Id. The first e-mail read:

> I don't want to hurt you! Just answer my calls. I am sorry! Just give me one last chance. Please just let me prove that I will change for you!! You changed your number! I've been calling your emergency number. I know you really don't look at it and keep it in your purse, Please. I am trying to fix this! I wouldn't have changed my number but Marc made me when we were going through all of this. I LOVE YOU ALISON[.] [sic].

Kostelnik Declaration Ex. A: E-Mails at 1. The second e-mail read:

> Alison, you are not being fair with me. All I ask is for one chance to talk to you. Why won't you answer my phone calls Alison? You are really upsetting me. I am willing to risk everything to come see you. I know I am on house arrest but I have to see you. I know once you see me everything will be Okay. Please don't make me do this! Answer my calls. I love you[.]

Id. at 2. The third e-mail, sent approximately three and a half hours after the second, read: "Babe, I disguised my email so I won't get in trouble for contacting you. We need

---

5 For ease of reference, citations to all depositions are to the original deposition transcript page numbers.

6 Although Officer Ford reported that the LCPD dispatched him on July 2, 2014, he later clarified in that he was dispatched on July 1, 2014. See Offense Report at 2; Ford Dep. at 75-77.

to talk. I love you babe. I got a smartphone, my number is 386-249-1448. Please, I don't want to fight. Please just talk to me. I love you[.]" Id. at 3 (emphasis in original).

Melissa also told Officer Ford that Benoit hacked her facebook account and called her 23 times over the past three days. See Offense Report at 3. Melissa showed Officer Ford her call history which displayed 23 incoming calls from the phone number provided in the third e-mail. See Ford Aff. ¶11; Offense Report at 3. Officer Ford reviewed Melissa's call history to determine and document the dates and times of the 23 calls. Id. at 101-103. In doing so, he observed that Melissa stored the caller's number under Benoit's name as an emergency contact and, according to his Offense Report, heard Benoit's voice on the voicemail greeting. See Offense Report at 3.[7] Melissa then filled out a Voluntary Statement (Doc. 34-5). See Offense Report at 3; Ford Dep. at 109; Voluntary Statement. In her Voluntary Statement, Melissa wrote:

> My ex, Jason Benoit, has a restraining order on him for my protection. In the last 3 days, I have received 23 phone calls from him, he hacked my facebook account, and emailed me from a disguised email account. I have ignored him, and he still continued calling me. This afternoon, I received the last email stating if I didn't answer the phone, he would come to my house. I am scared and don't want him anywhere near me, so I contacted the police. I know he will hurt me!

Voluntary Statement. Melissa signed the Voluntary Statement below the following affirmation:

> I have read each page of this statement consisting of 1 page(s), each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct. I also declare that I was not told or prompted what to say in this statement. This statement was completed at 8:00 P.M. on the 1 day of July, 2014.

---

[7] Although Officer Ford reported hearing Benoit's voice on the voicemail recording in his Offense Report, he did not specifically recall doing so at his deposition. See Offense Report at 3; Ford Dep. at 85.

Id. The Voluntary Statement also bears Officer Ford's signature as a witness. See id. In his deposition, Officer Ford testified that at the time of his interaction with Melissa, he had no reason to believe that her statements were anything but truthful. See Ford Dep. at 33-34. He further testified that although he "tried to be thorough," he "wanted to get it done and move on to the next call." Id. at 84. After leaving Melissa's residence, Officer Ford returned to the station to verify the existence and terms of the Injunction. Id. at 34-35, 88-89. Having done so, Officer Ford sought and obtained clearance from Sergeant Paul Cash to arrest Benoit. See Ford Dep. at 90-92.

Later that night, at approximately 7:30pm, Officer Ford and two deputies of the Columbia County Sheriff's Office went to Benoit's home located at 384 SW Saint Johns Street 101, Lake City, Florida 32055, to execute the arrest. See Arrest Report (Doc. 34-3; Arrest Report). Officer Ford advised Benoit of Melissa's allegations, which Benoit insisted were lies. See Deposition of Jason Benoit (Doc. 34-6; Benoit Dep.) at 30. Benoit asked Officer Ford for the phone number used to call Melissa and to see a copy of Melissa's Voluntary Statement. Id. at 30, 116-18.[8] Officer Ford told Benoit that he "did not have" the Voluntary Statement, which lead Benoit to believe that she did not prepare her statement until after his arrest. Id. at 115-16. Despite Benoit's protestations of innocence, the officers arrested him for: (1) willfully violating the Injunction in violation of Florida Statute section 741.31(4)(a)(5); (2) stalking in violation of Florida Statute section 784.048(2); and (3) violating the terms of his probation in violation of Florida Statute section 948.06.[9] See Arrest Report; Benoit Dep. at 29, 40. The Officers transported

---

[8] The record does not indicate whether Officer Ford provided Benoit with the phone number used to call Melissa's phone twenty-three times.

[9] It appears that Benoit's probation stemmed from charges he faced in 2008 for attempted trafficking,

Benoit to the Columbia County Jail for processing. See Arrest Report at 1-2. Then, Officer Ford prepared the Offense Report.[10] See Arrest Report at 1-2; Offense Report at 2.

Benoit believes that Officer Ford was unprofessional and rude during the arrest and that the deputies disagreed with Officer Ford's conduct. See Benoit Dep. at 105, 161-62. However, John A. Miles, an officer with the LCPD for the past 20 years, who held the position of Internal Affairs Sergeant in July of 2014, testified that "[t]here was no evidence that Officer Ford did anything inappropriate or unprofessional" on the night of Benoit's arrest. See Affidavit of John A. Miles (Doc. 34-10; Miles Aff.) ¶26. 11

On July 3, 2014, at Benoit's first appearance, a judge determined that Officer Ford had probable cause for the arrest. Id. ¶8; Benoit Dep. at 34. After his arrest, Benoit asked his girlfriend to have Ryan Nydam, an investigator for the Third Circuit State Attorney's Office, get in touch with him.[12] See Nydam Aff. ¶3; Deposition of Ryan Nydam (Doc. 34-8; Nydam Dep.) at 7-8. Benoit's girlfriend contacted Nydam the next day and arranged for him to meet with Benoit at the jail. See Nydam Aff. ¶4.[13] Benoit provided

---

possession of a controlled substance, and obtaining a controlled substance by fraud. See Benoit Dep. at 16. The record is devoid of information regarding the conditions of Benoit's probation.

10 On July 5, 2014, Officer Ford supplemented the Offense Report with the findings from his follow-up investigation. See Offense Report at 2-3. Officers frequently complete these supplemental offense reports "days after the initial arrest." See Affidavit of John A. Miles (Doc. 34-10; Miles Aff.) ¶15.

11 Although Benoit alleges in his Complaint that Officer Ford was under the influence of drugs when he responded to Melissa's 911 call and resigned "in lieu of termination for cause," see Complaint ¶¶14-15, Benoit neither addresses this allegation in the Response nor introduces any evidence to support it. More importantly, in his deposition, Benoit acknowledges that he does not have any evidence that Officer Ford was under the influence of drugs on the night he arrested Benoit. Benoit Dep. at 34-35. Thus, the Court will not consider this allegation further.

12 Nydam investigated a battery charge filed against Benoit in April 2014, which was ultimately dropped. See Nydam Dep. at 15-16.

13 Although Nydam stated that he spoke with Benoit's girlfriend on the day of Benoit's arrest in his affidavit, Nydam testified at his deposition that he met with Benoit's girlfriend at his office on July 2, 2014.

Nydam with his cell phone and computer log-in information. Id. ¶4. Nydam reviewed Benoit's devices and sent a subpoena to Verizon Wireless ("Verizon") requesting Benoit and Melissa's phone records. Id. ¶¶5-6.

Once Nydam received Verizon's response to the subpoena on July 12, 2014, he determined "that the evidence would not support the charges against [ ] Benoit beyond a reasonable doubt." See Nydam Aff. ¶7. As such, on July 28, 2014, the State Attorney's Office filed a "No Information" to drop the charges against Benoit. See Complaint and Demand for Jury Trial (Doc. 3; Complaint) ¶35. The State Attorney's Office also charged Melissa with filing a false police report in violation of Florida Statute section 837.05. See Nydam Aff. ¶7. Melissa pled guilty to this charge. Id. Officer Ford stopped working for the LCPD shortly after Benoit's arrest. See Ford Dep. at 8-9.

On May 4, 2017, Benoit filed his three count Complaint in the Circuit Court of the Third Judicial Circuit, in and for Columbia County, Florida. See Complaint. On July 25, 2017, Officer Ford removed the action to this Court. See Defendant's Notice of Removal (Doc. 1). In the Complaint, Benoit asserts two claims against Officer Ford for false arrest—one under federal law pursuant to 42 U.S.C. § 1983 (Section 1983) (Count I), and one under Florida law (Count III). See Complaint ¶¶38-44, 54-61. Alternatively, Benoit asserts a false arrest claim against the City under Florida law (Count II). Id. ¶¶45-53. As a result of the arrest, Benoit alleges that he spent a total of ten days in the Columbia County Jail and an additional twenty days in the Sarasota County Jail. Id. ¶¶34, 37. The City filed its answer on July 25, 2017, and Officer Ford filed his answer on August 15, 2017. See Answer of Defendant City of Lake City, Florida (Doc. 4); Defendant Gerald

---

See Nydam Aff. ¶3; Nydam Dep. at 7-8.

Ford's Answer to Plaintiff's Complaint (Doc. 15). On May 21, 2018, Defendants filed the Motions seeking entry of summary judgment in their favor.

## III. Standard of Review

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[14] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

---

[14] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV. Discussion

Benoit brings claims under Florida law against Officer Ford and the City for false arrest, as well as a federal claim under Section 1983 for false arrest against Officer Ford.[15] See Complaint ¶¶38-61. In the Motions, Defendants contend that they are entitled to

[15] In his Complaint, Benoit identifies his claim as being false arrest and/or false imprisonment. See id. Under Florida law, false arrest and false imprisonment are two terms for the same tort. See Jackson v. Navarro, 665 So. 2d 340, 340 (Fla. 4th DCA 1995) (stating that plaintiff sued sheriff "for false arrest, a/k/a false imprisonment"); Gatto v. Publix Supermarket, Inc., 387 So. 2d 377, 379 n.1 (Fla. 3d DCA 1980) ("We treat the false arrest and false imprisonment [claims] as one, since the difference is one of terminology only."). As such, the Court need not separately address Benoit's claims for false arrest and false imprisonment.

entry summary judgment in their favor because probable cause existed to arrest Benoit. See Ford's Motion at 5-9; City's Motion at 12-25. Additionally, Officer Ford contends that he is immune from Benoit's false arrest claim under Florida law pursuant to Florida Statute section 768.28(9)(a), and that he is entitled to qualified immunity against Benoit's Section 1983 claim. See Ford's Motion at 9-14. In the Response, Benoit contends that the Motions are due to be denied because Officer Ford conducted an insufficient investigation and did not have probable cause to execute his arrest. See Response at 4-8.

Benoit brings his false arrest claims under both federal and state law. Although defining the claim with some variation, both federal and Florida law recognize a cause of action for false arrest against a police officer and the officer's employing agency or municipality. See 42 U.S.C. § 1983; Case v. Eslinger, 555 F.3d 1317, 1326 (11th Cir. 2009) (recognizing that "a warrantless arrest without probable cause" presents a false arrest claim under § 1983); Willingham v. City of Orlando, 929 So.2d 43, 48 (Fla. 5th DCA 2006) (identifying false arrest as "the unlawful restraint of a person against that person's will"). But regardless of the law on which the claim is premised, "[p]robable cause constitutes an absolute bar to both state and § 1983 claims alleging false arrest." Rankin v. Evans, 133 F. 3d 1425, 1435 (11th Cir. 1998). In the Motions, the City and Officer Ford contend that they are entitled to entry of summary judgment in their favor because Officer Ford had probable cause to arrest Benoit. See Ford's Motion at 5-9; City's Motion at 12-25. When the facts of a case "are not in dispute, whether probable cause existed is a question of law, and summary judgment is appropriate." Marx v. Gumbinner, 905 F. 2d 1503, 1506 (11th Cir. 1990). Here, because there is no genuine dispute that Officer Ford

had probable cause to arrest Benoit, summary judgment is due to be entered in favor of Defendants.

The Eleventh Circuit has instructed "that the standard for determining the existence of probable cause is the same under both Florida and federal law."[16] Rankin, 133 F. 3d at 1434. Under both,

> [f]or probable cause to exist, … an arrest must be objectively reasonable based on the totality of the circumstances. This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) (internal quotation marks and citation omitted). As the Supreme Court recently explained:

> [t]o determine whether an officer had probable cause for an arrest, "we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Because probable cause "deals with probabilities and depends on the totality of the circumstances," it is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."

District of Columbia v. Wesby, 583 U.S. __, 138 S. Ct. 577, 586 (2018) (internal quotations and citations omitted). Ultimately, "[w]hether an officer possesses probable cause … depends on the elements of the alleged crime and the operative fact pattern." Brown v. City of Huntsville, Ala., 608 F.3d 724, 735 (11th Cir. 2010) (citations omitted). "[I]t is not necessary that an officer prove every element of [a] crime before making an arrest."

[16] "The only difference in the probable cause analysis applicable to" a false arrest claim under Florida and federal law "is which party carrie[s] the burden of proving whether probable cause exist[s]." Rankin, 133 F. 3d at 1436. Under Florida law, a defendant bears the burden of proving the existence of probable cause as an affirmative defense. Id. However, a plaintiff must demonstrate the absence of probable cause in order to prevail on a false arrest claim under Section 1983. Id.

Rhodes v. Kollar, 503 F. App'x 916, 924 (11th Cir. 2013) (citing Harrell v. United States, 875 F.2d 828, 830 (11th Cir. 1989)); United States v. Everett, 719 F.2d 1119, 1120 (11th Cir. 1983) (concluding that officers had probable cause to arrest criminal defendants even absent evidence of intent).

Officer Ford arrested Benoit for violating the Injunction, stalking, and violating the terms of his probation. With respect to the first offense, Florida Statute section 741.31(4)(a)(5) provides that "[a] person who willfully violates an injunction for protection against domestic violence. . . by [t]elephoning, contacting, or otherwise communicating with the petitioner directly or indirectly, unless the injunction specifically allows indirect contract through a third party[,] commits a misdemeanor of the first degree." See id. § 741.31(4)(a)(5). Further, Florida Statute section 784.048 provides that "[a] person who willfully, maliciously, and repeatedly follows, harasses[17], or cyberstalks[18] another person commits the offense of stalking, a misdemeanor of the first degree." See id. § 784.048. Lastly, Florida Statute section 948.06(1)(a) provides that whenever an officer has reasonable grounds to believe that one has violated the terms of his probation in a material respect, the officer may arrest the probationer without a warrant. See id. § 948.06(1)(a).

In the Motions, Defendants argue that probable cause existed to arrest Benoit based on: (1) Officer Ford's review of the Injunction; (2) Officer Ford's observations of

---

17 "'Harass' means to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." See Fla. Stat. § 784.048(1)(a).

18 "'Cyberstalk' means to engage in a course of conduct to communicate, or to cause to be communicated, words, images, or language by or through the use of electronic mail or electronic communication, directed at a specific person, causing substantial emotional distress to that person and serving no legitimate purpose." See Fla. Stat. § 784.048(1)(d). "'Course of conduct' means a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose." Id. § 784.048(1)(b).

Melissa's demeanor; (3) Officer Ford's review of the e-mails that Benoit purportedly sent to Melissa under a disguised e-mail address; (4) Officer Ford's review of Melissa's call history reflecting that she had 23 missed calls from a phone number saved under Benoit's name in Melissa's phone; (5) Officer Ford's belief that he heard Benoit's voice on the voicemail associated with that phone number; and (6) Melissa's Voluntary Statement. See Ford's Motion at 7-9; City's Motion at 12-19, 22-25; see also First Set of Interrogatories (Doc. 34-9; First Interrogatories) ¶17. In the Response, Benoit contends that probable cause did not exist for his arrest because Officer Ford either conducted a reasonable investigation and ignored exculpatory evidence, or failed to conduct a sufficient investigation. See Response at 7.

As discussed, the crime of willfully violating a domestic violence injunction consists of two elements: (1) "a temporary or final injunction for protection against domestic violence was issued by a court against the defendant," and (2) "the defendant willfully violated the injunction by committing an act of domestic violence against the petitioner." Barger v. Crews, No. 3:12-cv-185/RV/EMT, 2013 WL 646252, at *7 (N.D. Fla. Jan. 11, 2013); see also In re: Standard Jury Instructions in Criminal Cases-Report 2016-04, 206 So. 3d 14, 17 (Fla. 2016). The parties do not dispute that the state court issued the Injunction and that Officer Ford was aware of its terms. See Offense Report at 3; Ford Dep. at 25-28, 34-35, 88-89. Thus, the only issue before the Court is whether there is any genuine dispute regarding the reasonableness of Officer Ford's belief that Benoit willfully violated the Injunction.

First, the Court notes that the fact that the state attorney's office dropped the charges against Benoit "is of no consequence in determining the validity of the arrest itself."

Marx, 905 F. 2d at 1507. Indeed, "[t]he Constitution does not guarantee that only the guilty will be arrested." Baker v. McCollan, 443 U.S. 137, 145 (1979).

Next the Court turns to the information presented to Officer Ford. Melissa's Voluntary Statement was evidence on which Officer Ford could rely to "a meaningful degree in determining the existence of probable cause." Rankin, 133 F.3d at 1440. Indeed, Officers are generally "entitled to rely on a victim's criminal complaint as support for probable cause." Id. at 1441; see also Lawson v. City of Miami Beach, 908 F. Supp. 2d 1285, 1290 (S.D. Fla. 2012); Miami-Dade Cnty v. Asad, 78 So. 3d 660, 670 (Fla. 3d DCA 2012). Notably, complaints by citizen-informants,[19] like Melissa, are considered particularly reliable for many reasons:

> First, a citizen informant may be motivated not by pecuniary gain, but by the desire to further justice. Second, unlike an anonymous tipster, a witness who directly approaches a police officer may be held accountable for false statements. Third, a face-to-face tip may be viewed as more reliable because the officers who receive the tip have the opportunity to observe the demeanor and evaluate the credibility of the person offering the information. Fourth, a witness who approaches the police in person may subject himself or herself to potential reprisal from the defendant, thereby rendering the tip more reliable than an anonymous tip.

Baptiste v. State of Fla., 995 So. 2d 285, 291 (Fla. 2008) (internal citations omitted). As such

> if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary. Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case.

[19] "[A] citizen-informant is an ordinary citizen who has either been the victim of or a witness to a crime and who reports the pertinent facts to law enforcement officials." Wallace v. State of Fla., 964 So. 2d 722, 728 (Fla. 2d DCA 2007).

Illinois v. Gates, 462 U.S. 213, 233-34 (1983) (internal citation omitted).

Here, Benoit fails to provide any evidentiary basis to dispute Officer Ford's contention that he had no reason to believe Melissa wasn't being truthful, i.e. an "honest citizen." See Ford Dep. at 33-34. Although Melissa had filed false police reports against Benoit in the past, there is no evidence to suggest that Officer Ford was, or had reason to have been, aware of these reports at the time of the arrest. See Benoit Dep. at 38, 52-53; see also Taylor v. Taylor, 649 F. App'x 737, 744 (11th Cir. 2016) (finding that an officer properly relied on a claimant's report that the plaintiff made harassing phone calls and terroristic threats because the plaintiff "pointed to no information known to [the officer], or reasonably available to him, that would have indicated to him that [the claimant] was unreliable and untrustworthy."). Officer Ford was "not required to seek out reasons to doubt [Melissa's] claim." See Armatas v. Maroulleti, No. 08-CV-310 (SJF)(RER), 2010 WL 4340437, at *7 (E.D.N.Y. Oct. 19, 2010), adopted in relevant part, 2010 WL 4340334 (E.D.N.Y. Oct. 22, 2010), aff'd in relevant part, 484 F. App'x 576 (2d Cir. 2012); see also State v. Clark, 721 So. 2d 1202, 1206 (Fla. 3d DCA 1998) ("[I]t is well-settled that citizen information need not be independently verified."). Moreover, even if Officer Ford had some doubt as to Melissa's veracity, her detailed, specific description of the alleged wrongdoing combined with her presentation of the Injunction, the e-mails and her telephone with its call history, as well as her written Voluntary Statement that the events occurred, entitled that her report be given "greater weight" than might otherwise be the case. See Gates, 462 U.S. at 234.

Importantly, however, Officer Ford did not rely exclusively on Melissa's report or her Voluntary Statement. Prior to arresting Benoit, Officer Ford looked for corroboration of

Melissa's allegations. He independently verified the terms of the Injunction, reviewed the e-mails purportedly sent by Benoit, and reviewed Melissa's phone log to determine the dates and times of the 23 calls. See Offense Report at 3.

Despite these efforts, Benoit contends that Officer Ford's investigation was deficient because he ignored Benoit's protestations of innocence and failed to obtain phone records from Verizon prior to making the arrest. See Response at 5-7. In support of this contention, Benoit cites Charlson v. Rutherford, No. 3:15-cv-724-J-34MCR, Doc. 26 (M.D. Fla. Mar. 30, 2016), in which this Court acknowledged that:

> "[a]n arresting officer is required to conduct a reasonable investigation to establish probable cause." Rankin, 133 F.3d at 1435. An officer may not "choose to ignore information that has been offered to him or her … [or] conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts …." Kingsland v. City of Miami, 382 F.3d 1220, 1229 (11th Cir. 2004). Indeed, "[a] police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when … it is unclear whether a crime [has] even taken place." BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) (alterations added) see also Ahlers v. Schebil, 188 F.3d 365, 372 (6th Cir. 1999) ("[O]fficers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone."). Although officers "need not conduct a 'mini-trial' before making an arrest, … probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (internal citations omitted).

See Response at 5-6 (quoting Charlson, No. 3:15-cv-724, Doc. 26 at 17 (some internal citations modified from original)). However, as the City notes in its Reply, Benoit omits the remainder of the quotation, in which the Court explained that despite the duty to conduct a reasonable investigation:

> "[a]n officer does not have to take 'every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person.'" See Williams v. City of Homestead, Fla., 206 F. App'x 886, 888 (11th Cir. 2006) (quoting Tillman v. Coley, 886 F.2d 317, 321 (11th Cir. 1989)). Moreover,

> "while a police officer should consider a suspect's explanation in evaluating the existence of probable cause, he 'is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego [sic] arrest pending further investigation if the facts as initially discovered provide probable cause.'" Id. at 888–89 (quoting Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988)).

See Reply at 2 (quoting Charlson, No. 3:15-cv-724, Doc. 26 at 17). Here, because Officer Ford had probable cause to arrest Benoit before Benoit professed his innocence, he was not required to accept Benoit's protestations. Indeed, Officer Ford was "not required to sift through conflicting evidence or resolve issues of credibility so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed." See Dahl v. Holley, 312 F. 3d 1228, 1234 (11th Cir. 2002) (finding that exculpatory statements did not prevent the officers from having probable cause), abrogated on other grounds, Lozman v. City of Riviera Beach, Fla., 585 U.S. __, 138 S. Ct. 1945 (2018).

Similarly, Officer Ford was not required to await Verizon's response to Nydam's subpoena before arresting Benoit, as that information was not "easily discoverable" or available at the time of Ford's probable cause determination. See Kingsland, 382 F.3d at 1229. Indeed, Verizon took ten days to respond to the subpoena issued by Investigator Nydam. See Nydam Aff. ¶6. According to Officer Miles, "when conducting an initial investigation in the field, it is important that an officer take information at face value, especially in the context of domestic violence," as the consequences of not doing so "can be severe." See Miles Aff. ¶23. Unlike an investigator, who "has more time to gather facts and ask questions . . . [a] patrol officer's role is to assure safety, obtain preliminary information necessary to establish probable cause and, when appropriate, to issue a written report." Id. ¶25. At the time of the arrest, Officer Ford had probable cause to believe that Benoit had willfully violated the Injunction and that any delay in executing the

arrest could jeopardize Melissa's safety. See Ford Dep. at 106. Thus, there is no genuine dispute that based on the totality of circumstances, Officer Ford performed a reasonable investigation and had probable cause to arrest Benoit for violating the Injunction.

Benoit attempts to create an issue of fact by arguing that Officer Ford ignored exculpatory evidence, specifically Melissa's cell phone history. Response at 5. However, he fails to present any explanation of how this cell phone history was exculpatory. Further, he presents no evidence to support even an inference that at the time Officer Ford reviewed the cell phone history he could have suspected that the calls were not from Benoit as Melissa alleged.

Benoit also argues that Officer Ford's testimony should not be credited because it is implausible and because in Benoit's view, he was "evasive" in his deposition. Id. at 6. In doing so, Benoit points to Officer Ford's inability to recall certain details about Melissa's phone, none of which would have been relevant to his analysis of probable cause. While he argues that Officer Ford suffers from "credibility problems," Response at 7, Benoit points to no evidence creating any issue of fact regarding the circumstances of Officer Ford's interaction with Melissa, the information presented to and known by him, or the actions that he took in determining the existence of probable cause. "To defeat summary judgment [Benoit] must point to 'specific facts' such that a reasonable jury could return a verdict in his favor." Federal Trade Commission v. Lanier Law, LLC, 715 F. App'x 970, 979 (11th Cir. 2017). As such, "[a] general objection that an opposing party's evidence is incredible, like the one [Benoit] raised here, is insufficient to overcome summary judgment." Id.

Notably, the parties do not address whether Officer Ford had probable cause to arrest Benoit for stalking or violating the conditions of his probation. See generally Ford's Motion; City's Motion. However, "so long as probable cause existed to arrest [Benoit] for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses, or even all announced charges." Whittington v. Town of Surfside, 490 F. Supp. 2d 1239, 1251 (S.D. Fla. 2007), aff'd on other grounds, 269 F. App'x 918 (11th Cir. 2008); see also Lee, 284 F. 3d at 1196 ("[T]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest.") (citation omitted). Thus, the Court need not consider whether probable cause existed to arrest Benoit for these other charges, and summary judgment is due to be entered in favor of Defendants as to all three false arrest claims set forth in the Complaint.[20]

## V. Conclusion

The Court finds that Officer Ford had probable cause to arrest Benoit, and as such, Benoit's false arrest claim whether under Florida law or Section 1983 must fail. Thus, the Motions are due to be granted. In light of the foregoing, it is **ORDERED:**

1. Defendant Gerald L. Ford's Dispositive Motion for Summary Judgment (Doc. 33) is **GRANTED**.
2. Defendant City of Lake City's Motion for Summary Judgment (A Dispositive Motion) and Memorandum of Law (Doc. 34) is **GRANTED**.

[20] Because the existence of probable cause is an absolute bar to Benoit's false arrest claims under both federal and Florida law, the Court need not consider Officer Ford's alternative arguments that he is entitled to qualified immunity with regard to the federal § 1983 claim and statutory immunity pursuant to Florida Statute section 768.29(9)(a) for the Florida state law claim. Of course, given the Court's conclusion that Officer Ford had actual probable cause, Officer Ford certainly had arguable probable cause. As such, Officer Ford would be entitled to qualified immunity.

3. The Clerk of Court is directed to enter **JUDGMENT** in favor of Defendants City of Lake City, Florida and Gerald L. Ford and against Plaintiff Jason Benoit.
4. The Clerk of Court is further directed to terminate all remaining pending motions as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 16th day of October, 2018.

**MARCIA MORALES HOWARD**
United States District Judge

Lc25
Copies to:
Counsel of Record